IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. **04 - 80754**

EQUIFAX INC.,

     Plaintiff,

v.

**CIV-PAINE**

**MAGISTRATE JUDGE JOHNSON**

AUSTIN VENTURES VII, L.P.; AUSTIN
VENTURES VIII, L.P.; DAN BABB; TY
BAINES; BERJ, LLC (F/K/A BERJ, INC.);
RODGER BERMAN; MICHAEL BRAUSER;
ROBERT CONLEY; PHIL DAVIS; DEREK
DUBNER; MARK EDDY; CHARLES
EISSA; KEVAN FLEMING; SCOTT
FROHMAN; TOM HICKEY; RICHARD
HILL; SCOTT HIRSCH; RICHARD
KAUFMAN; JEFF KILLEEN; JOHN
LOGAN; DAVID MARCIL; ADAM
MITTELBURG; LOU NOBILE; ELDER
RIPPER; MARC RONA; RICK SCHELL;
SEISINT, INC.; STEVE SICCONE;
SOFTBANK CAPITAL PARTNERS LP;
SOFTBANK CAPITAL ADVISORS FUND
LP; SOFTBANK CAPITAL LP; STEVE
STOWELL; SWEEPSCLUB.COM, INC.;
SCOTT THALER; TL VENTURES III L.P.;
TL VENTURES III INTERFUND, L.P.;
TL VENTURES III OFFSHORE, L.P.;
TL VENTURES IV L.P.; TL VENTURES IV
INTERFUND, L.P.; VENTURE
DEVELOPMENT CENTER, INC. and
DAVID WOOD,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT TO PRESERVE CLAIMS PENDING ARBITRATION

    Plaintiff, Equifax Inc. ("Equifax"), files this Complaint to Preserve Claims Pending

Arbitration to preserve the claims herein asserted against any statutes of limitations if such

claims were determined not to be arbitrable.  Equifax contends that the claims set forth below are

arbitrable, and Equifax has asserted the claims in an arbitration that is presently pending (except for Counts Four and Five, which Equifax may seek to add to the arbitration and which, in any event, Equifax is agreeable to having stayed at this time). Promptly after the appearance of defendants herein, Equifax will seek to stay this action pending arbitration. Subject to and without waiving its right to arbitrate the claims set forth herein, Equifax alleges as follows:

<u>ARBITRABILITY OF CLAIMS ASSERTED</u>

1.

Effective August 15, 2002, via merger, Equifax acquired the stock of a Florida corporation, Naviant, Inc., now Equifax eMarketing Solutions, Inc. (hereinafter "Naviant"). Naviant provides direct and web-based marketing services. After the acquisition, Equifax determined that it was fraudulently induced to acquire Naviant on the basis of materially false and misleading information and data furnished to Equifax in connection with the acquisition, including, but not limited to, intentional manipulation of Naviant's financial statements and records, and on the basis of materially false and misleading omissions and representations made to Equifax in connection with the acquisition.

2.

Pursuant to the "Dispute Resolution" provision in Paragraph 14.4 of the Agreement and Plan of Merger by and among Equifax, Armagh Acquisition Corporation, Naviant, Inc. and Softbank Capital Partners, LP, as Shareholders' Representative, dated August 15, 2002 (the "Merger Agreement"), Equifax and Naviant initiated arbitration against the Company Shareholders and Former Option Holders of Naviant, all of whom are named as defendants herein. Equifax and Naviant filed a Demand for Arbitration with the American Arbitration Association in March 2004.

2

3.

Certain of defendants, who are respondents in the arbitration, contend that some of the claims that Equifax and Naviant have asserted in the arbitration are not arbitrable.  Eleven of those defendants, who are Company Shareholders of Naviant, have filed suit in this Court to avoid being required to arbitrate any claims except those for recovery from an escrow fund against defendant, Softbank Capital Partners, LP ("Softbank"), in its capacity as Shareholders' Representative.  That action, styled *Softbank Capital Partners LP, et al. v. Equifax Inc. and Naviant, Inc.*, Case No. 04-20994-CIV-GRAHAM (hereinafter the "Federal Action"), is still pending.  The eleven Company Shareholders who are plaintiffs in the Federal Action are Softbank Capital Partners LP, Softbank Capital Advisors Fund LP, Softbank Capital LP, Austin Ventures VII, L.P., Austin Ventures VIII, L.P., TL Ventures III L.P., TL Ventures III Interfund, L.P., TL Ventures III Offshore, L.P., TL Ventures IV L.P., TL Ventures IV Interfund, L.P. and BERJ, LLC, formerly known as BERJ, Inc.; and they are referred to hereinafter as the "Federal Action Plaintiffs."

4.

The Federal Action Plaintiffs have sought summary judgment that they are not required to arbitrate.  Equifax and Naviant have filed a motion to dismiss the Federal Action on the grounds that the Federal Action Plaintiffs are bound by the Merger Agreement and are required to arbitrate. The motions are fully briefed and the parties are awaiting a decision by the Court.

5.

One of the claims Equifax has asserted is a claim for rescission under the Florida Securities and Investor Protection Act, Fla. Stat. Ann. § 517.211, pursuant to which Equifax is seeking to rescind its acquisition of Naviant and to recover the consideration it paid, plus interest

ATLLIB01 1785694.4

and reasonable attorney's fees.  Any claim brought under the Florida Securities and Investor Protection Act is subject to a two-year statute of limitations running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, but not more than 5 years from the date such violation occurred.

6.

Were a court or the Arbitrators to rule that any of Equifax's claims were not arbitrable, such a final ruling would come after August 15, 2004, which is the two-year anniversary of the acquisition.  Accordingly, to avoid any potential limitations issue and to preserve its claim under the Florida Securities and Investor Protection Act and other claims it has asserted in the pending arbitration, Equifax is here asserting certain of its claims in the event it should become necessary to litigate them in Court.

7.

Because the claims asserted here are arbitrable and are presently the subject of a properly and timely filed arbitration (except for Count Five, which is discussed below in Paragraph 8), this lawsuit should be stayed pending arbitration unless and until there is a final decision that any of the claims are not arbitrable or until confirmation of an arbitration award is sought.  Equifax will promptly seek such a stay upon the appearance of the defendants.

8.

In addition to its other claims, Equifax is here asserting claims against defendants, Michael Brauser ("Michael Brauser") and Seisint, Inc. for breach of the Selling Shareholders Agreement made and entered into as of August 15, 2002, by and among Equifax, Armagh Acquisition Corporation and the Company Shareholders of Naviant.  These claims, which are set forth below in Counts Four and Five, are not presently among the claims Equifax has asserted in

4

the arbitration. Equifax will explore whether these claims should be arbitrated and whether a stay of this case should be sought as to these claims pending arbitration of Equifax's other claims, the resolution of which could obviate any need to preserve these claims.

<u>PARTIES, JURISDICTION AND VENUE</u>

9.

Equifax is a corporation organized and existing under the laws of the State of Georgia with its principal place of business at 1550 Peachtree Street, Atlanta, Georgia 30309. Equifax is an information services company best known for its consumer credit reporting and marketing services.

10.

Defendants are the following, who are the Company Shareholders and Former Option Holders of Naviant:

<u>Company Shareholders</u>

| | |
|---|---|
| Austin Ventures VII, L.P. | Softbank Capital LP |
| Austin Ventures VIII, L.P. | SweepsClub.com, Inc. |
| BERJ, LLC (f/k/a BERJ, Inc.) | TL Ventures III L.P. |
| Michael Brauser | TL Ventures III Interfund, L.P. |
| Seisint, Inc. | TL Ventures III Offshore, L.P. |
| Softbank Capital Partners LP | TL Ventures IV L.P. |
| Softbank Capital Advisors Fund LP | TL Ventures IV Interfund, L.P. |

<u>Former Option Holders</u>

| | |
|---|---|
| Dan Babb | Richard Kaufman |
| Ty Baines | Jeff Killeen |
| Rodger Berman | John Logan |
| Michael Brauser | David Marcil |
| Robert Conley | Adam Mittelburg |
| Phil Davis | Lou Nobile |
| Derek Dubner | Elder Ripper |
| Mark Eddy | Marc Rona |
| Charles Eissa | Rick Schell |
| Kevan Fleming | Steve Siccone |

| Scott Frohman | Steve Stowell |
|---|---|
| Tom Hickey | Scott Thaler |
| Richard Hill | Venture Development Center, Inc. |
| Scott Hirsch | David Wood |

The address of each Company Shareholder and Former Option Holder is shown separately at Exhibit 1 hereto. Each defendant is subject to the personal jurisdiction of this Court, either as a resident of the State of Florida or by virtue of Florida's long-arm statute, Fla. Stat. Ann. § 48.193.

11.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

12.

Venue is proper in this district pursuant to 28 U.S.C. § 1391.

FACTUAL BACKGROUND

A.    Representations and Warranties in the Merger Agreement

13.

Equifax and its wholly-owned subsidiary, Armagh Acquisition Corporation ("Armagh"), a merger subsidiary that ceased to exist after Equifax purchased Naviant's stock, entered into the Merger Agreement with Naviant and Softbank, as Shareholders' Representative. In the Merger Agreement, Equifax is identified as "EFX," Armagh is identified as "Merger Sub," Naviant is identified as "Company," and Softbank is identified as "Shareholders' Representative."

14.

Naviant's web-based marketing services included developing and delivering e-mail marketing campaigns that allowed its customers to identify, target and reach online consumers,

6

who had consented to receive marketing information (opt-in e-mail) and whose e-mail addresses and other demographic data were housed in Naviant's databases.

15.

Article 6 of the Merger Agreement contains various representations and warranties by Naviant concerning its databases, the disclosure of information to Equifax, the accuracy and completeness of Naviant's books and records, the validity of Naviant's accounts receivable, the propriety of Naviant's contractual obligations and various other matters affecting Naviant's financial statements and financial condition as of August 15, 2002.

16.

Article 6 provides that "[t]o induce EFX and Merger Sub to enter into and perform this Agreement, Company represents and warrants to EFX and Merger Sub that except as set forth in the Disclosure Memorandum, each of the representations, warranties and statements in the following paragraphs of this Article 6 is true and correct as of the date of this Agreement [i.e., August 15, 2002]."

17.

Specifically, Article 6 includes the following representations and warranties by Naviant to Equifax and Armagh:

a.      Paragraph 6.32, entitled "Disclosure," provides that

> Neither this Agreement, the Disclosure Memorandum (including the Financial Statements) nor any certificate delivered by or on behalf of Company or any Subsidiary thereof in connection with the Closing of the transactions contemplated hereby or thereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, viewed as a whole, in light of the circumstances under which they are made, not misleading.  To the Knowledge of Company, there is no fact which materially and adversely affects the business, assets, properties, operations, prospects, condition (financial or otherwise), results of operations or liabilities of

7

Company or any Subsidiary thereof that has not been set forth or disclosed in this Agreement or in such other or certificates. Company has delivered and made available true and complete copies of each material document (to the extent such documents exist), or true and complete summaries thereof, requested by EFX in writing prior to the date of this Agreement.

b.     Subparagraph (b) of Paragraph 6.28, entitled "Books and Records," provides that

The books, records and accounts of Company and its Subsidiaries (i) are accurate and complete in all material respects and have been maintained in accordance with good business practices on a basis consistent with prior years, (ii) are stated in reasonable detail and accurately and fairly reflect the transactions and dispositions of the respective assets of the Company and each Subsidiary thereof and (iii) accurately and fairly reflect the basis for the Financial Statements.

c.     Subparagraph (c) of Paragraph 6.28, entitled "Books and Records," provides that

Company and each Subsidiary thereof has implemented and maintained a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with GAAP consistently applied and (B) to maintain accountability for assets; and (iii) the amount recorded for assets on the respective books and records of the Company and the subsidiaries is compared with the existing assets at reasonable intervals in connection with the preparation of annual audits of the Company's financial statements and appropriate action is taken with respect to any differences.

d.     Paragraph 6.16, entitled "Receivables," provides that

All notes and accounts receivable shown on the Most Recent Balance Sheet [i.e., the unaudited balance sheet as of July 31, 2002] and all such receivables now held by Company or any Subsidiary are valid and collectible obligations and were not and are not subject to any offset or counterclaim, except for amounts reserved against such receivables which are reflected on the Most Recent Balance Sheet and with respect to notes and accounts receivable arising after the date of the Most Recent Balance Sheet and now outstanding, except for a percentage thereof equal to the percentage which said reserved amounts on the Most Recent Balance Sheet constituted of the aggregate of notes and accounts receivable on the Most Recent Balance Sheet. Except for the accounts receivable acquired pursuant to the Reorganization Agreement, all of such notes and accounts receivable arose in the ordinary course of business from the sale of goods

8

or the rendition of services and represent bona fide obligations of the account debtor thereof.

e.    Subparagraph (c) of Paragraph 6.12, entitled "Compliance; Licenses and Permits," provides that

> All information (the "Database Information") contained in the databases maintained by Company and any Subsidiary thereof (the "Databases") has been at all times (i) collected in substantial compliance with fair information collection practices (including but not limited to (a) the guidelines promulgated by the Online Privacy Alliance; (b) the standards promulgated by the Direct Marketing Association, and (c) all applicable Federal, state and other laws, rules and regulations including but not limited to those relating to the use or collection of information collected from or about consumers) so that, at a minimum and prior to submitting any information to Company or its agents, Internet users received notice of how the information will be used and a choice whether to submit such information; and (ii) stored, maintained and used in accordance with such notices and all Federal, state and local laws, rules and regulations. Company has the sole and exclusive right to use and commercially exploit the Database Information, free of consideration to any third party. The Databases contain, at a minimum, 65,000,000 Valid and Unique Records. For purposes of this Agreement, a "Valid and Unique Record" is (i) a Record with an e-mail address that accepts delivery of email transmissions (i.e., emails are not rejected as "undeliverable"); and (ii) a subject Record is not duplicative of other Records contained in any of the Databases. For purposes of this Agreement, a "Record" is a set of information consisting of: (i) one "opt-in" or "permission-based" e-mail address, and (ii) the first and last name of the e-mail user that uses such e-mail address. In determining whether there are 65,000,000 Valid and Unique Records, a duplicative Record will be counted only once.

f.    Paragraph 6.10, entitled "Contracts and Commitments," provides that "[n]either Company nor any Subsidiary thereof is a party to any written or oral contract not made in the ordinary course of business. . . .   The Disclosure Memorandum sets forth a true, correct and accurate list of the Contracts.   Each Contract constitutes the valid and binding obligation of Company or Subsidiary. . . ."

ATLLIB01 1785694.4

g.   Paragraph 6.9, entitled "Absence of Undisclosed Liabilities," provides that

As of the date of the Most Recent Balance Sheet [i.e., the unaudited balance sheet as of July 31, 2002], (a) neither Company nor any Subsidiary thereof had any Liabilities which were not provided for or disclosed on the Most Recent Balance Sheet except Liabilities for Actions disclosed on Schedule 6.13 of the Disclosure Memorandum and (b) all liability reserves which were required to be reserved or disclosed in accordance with GAAP were so reserved or disclosed on the Most Recent Balance Sheet.  At the date of the Most Recent Balance Sheet, there were no loss contingencies (as such term is used in Statement of Financial Accounting Standards No. 5 ("SFAS No. 5") issued by the Financial Accounting Standards Board in March 1975) which were not adequately provided for in the Most Recent Balance Sheet as required by said SFAS No. 5.  Since the date of the Most Recent Balance Sheet, neither Company nor any Subsidiary thereof has incurred any Liabilities except current Liabilities incurred in the ordinary course of business, consistent with past practices, none of which involves a Liability for breach of contract, breach of warranty, infringement of intellectual property rights, tortious conduct or violation of Law.

h.   Paragraph 6.8, entitled "Absence of Changes," provides that

Since the Balance Sheet Date [i.e., December 31, 2001]:

(a) there has been no Material Adverse Change;

(b) neither Company nor any Subsidiary thereof has entered into any material transaction which was not in the ordinary course of business;
. . .

(o) there has not been any change in the accounting methods, practices or policies followed by Company or any Subsidiary thereof. . . .

i.   Paragraph 6.7, entitled "Financial Statements; No SEC Filings," provides that

The Disclosure Memorandum contains the consolidated financial statements of Company and each Subsidiary thereof, consisting of a balance sheet (the "Balance Sheet") and the related statements of operations, changes in stockholders' equity, and of cash flows, together with any related notes and schedules for the periods as at and ending December 31, 2001 and the report thereon of PWC (the "Balance Sheet Date") (the "Audited Financial Statements").  The Audited Financial Statements have been prepared in accordance with GAAP consistently applied, present fairly the consolidated financial condition of Company and its Subsidiaries as at the respective dates thereof and the results of its

10

operations and cash flows for the periods then ended, and are complete and consistent with the books and records of Company and each Subsidiary thereof. The Disclosure Memorandum contains the consolidated unaudited financial statements of the Company and its Subsidiaries as at and ending at the conclusion of (a) each fiscal quarter following December 31, 2001, and at March 31, 2002 and June 30, 2002 and (b) an unaudited balance sheet as of July 31, 2002 (the "Most Recent Balance Sheet") as at such date (the "Unaudited Financial Statements"; together with the Audited Financial Statement, the "Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied (except for the absence of required footnotes and subject to normal and recurring year-end audit adjustments not material in amount), present fairly the financial position and the results of operations of the Business as conducted by Company and its Subsidiaries for the periods as at and then ended, and are complete and consistent with the books and records of Company and each Subsidiary thereof. . . .

18.

"Knowledge of Company" or "Company's Knowledge" is defined in Article 1 of the

Merger Agreement to mean

> any fact, circumstance, event or other matter that (a) any of Michael Brauser, Rick Schell, Scott Hirsch, Derek Dubner, Rodger Berman, Richard Kaufman, Steven Stowell, or any director of Company actually knows, or (b) any of the individuals referred to in the preceding clause (a) should know or would reasonably be expected to know in the normal discharge of his assigned duties and responsibilities.

(Merger Agreement at 4)

19.

"Material Adverse Change" is defined to mean

> any event, change, effect or occurrence that, individually or together with any other event, change, effect or occurrence, (a) is, or could reasonably be expected to be, materially adverse to the business, assets, capitalization, properties, operations, prospects, condition (financial or otherwise), actual or anticipated results of operations or liabilities (contingent or otherwise) of the Business, Company or any Subsidiary thereof, (b) prevents or materially delays the performance by Company of its obligations under this Agreement or (c) has or could reasonably be expected to have, a

11

material adverse effect on the ability of EFX to operate the Business immediately after the Effective Time.

(Id. at 5)

20.

"Business" is defined in Article 1 to mean

> all of the businesses as presently conducted and as presently proposed to be conducted by Company and each Subsidiary thereof, including the provision of on-line direct marketing products and services, the collection of opt-in consumer data, the management of email lists, the management of a database which aggregates permission-based email addresses and related preference, demographic and lifestyle information, and the brokerage of third-party email lists.

(Id. at 2)

21.

"GAAP" is defined in Article 1 to mean "United States generally accepted accounting principles, consistently applied, as in effect from time to time." (Id. at 4)

B.    Indemnification by Company Shareholders and Former Option Holders

22.

Equifax purchased all of the issued and outstanding stock of Naviant, including shares subject to outstanding options, in exchange for $135,000.000, less certain agreed upon adjustments.

23.

In Article 11 of the Merger Agreement, the Company Shareholders and Former Option Holders agreed to indemnify Equifax and its Affiliates, including Naviant, from and against any damage, loss and expense, including attorney's fees, incurred as a result of any breach of Naviant's representations and warranties in Article 6.

12

24.

Specifically, Paragraph 11.1 of the Merger Agreement, entitled "Indemnification," provides that in consideration of their receipt of any Merger Consideration, the Company Shareholders and Former Option Holders, as Indemnitors,

> will, jointly and severally, indemnify and hold harmless EFX and its Affiliates (which shall include with effect from the Closing, Company and each Subsidiary thereof) and their respective officers, directors, agents, employees and stockholders, other than any officer, director, agent or employee who immediately prior to the Closing was a Company Shareholder or an officer, director, agent or employee of a Company Shareholder (collectively, "Indemnitees"), from and against and in respect of any and all loss, damage, liability, cost and expense, including reasonable attorneys' fees and amounts paid in settlement (collectively, the "Indemnified Losses"), suffered or incurred by any one or more of the Indemnitees by reason of, or arising out of:
>
> (a)    any misrepresentation, breach of warranty or breach or nonfulfillment of any agreement of Company (without regard to any materiality or Company Material Adverse Change qualifications contained therein) contained in this Agreement, the Disclosure Memorandum, or in any other certificate, schedule, instrument or document delivered to EFX by or on behalf of Company pursuant to the provisions of this Agreement. . . .;
>
> . . . ; and
>
> (o)    any and all Actions, suits, proceedings, claims, demands, assessments, judgments, fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid any Actions, suits, proceedings, claims, demands, assessments, judgments, fees and expenses or to oppose the imposition of any Actions, suits, proceedings, claims, demands, assessments, judgments, fees and expenses, or in enforcing the provisions of this Paragraph 11.1.

25.

In accordance with Paragraph 4.10(a) of the Merger Agreement, the parties placed $10,000,000 of the purchase price in escrow to secure the Company Shareholders and Former

Option Holders' indemnification obligations (together with all accrued interest thereon, except as provided in the Escrow Agreement, the "Escrow Fund"). (Merger Agreement ¶ 4.10(a))

26.

Subject to two express exceptions, claims for indemnified losses made pursuant to Article 11 are to be satisfied out of the Escrow Fund. One of the exceptions, which applies here, is for "claims arising out of fraud, intentional misrepresentation, willful misconduct or criminal conduct." As to such claims, Equifax and Naviant have full recourse against the Indemnitors, jointly and severally. (Id. ¶ 11.4)

C.    "Pump and Dump" Scheme and Spurious Transactions

27.

Following Equifax's purchase of Naviant's stock effective August 15, 2002, many individuals who had served as employees and officers of Naviant before the acquisition continued to be employed by Naviant, including the following individuals who were responsible for managing key aspects of Naviant's business:

a.      Michael Brauser, who served as Naviant's President and Chief Executive Officer and was a member of its Board of Directors before the acquisition, became General Manager and Senior Vice President of Naviant. Mr. Brauser was General Manager and Senior Vice President of Naviant from August 2002 until his departure in April 2003, during which time he was primarily responsible for Naviant's day-to-day operations.

b.      Richard Kaufman, who served as Executive Vice President of Naviant and President of Naviant's Performance Division before the acquisition, was a Vice President of Naviant from August 2002 until his departure in July 2003. Mr. Kaufman also was President and Chief Executive Officer of SweepsClub.com, Inc., which is one of the Company Shareholders.

14

c.    Rodger Berman, who served as Naviant's Senior Vice President of Corporate Development before the acquisition, was a Vice President of Naviant from August 2002 until his departure in June 2003.

d.    Steve Stowell, who served as Naviant's Vice President of Finance before the acquisition, was a Vice President and Chief Financial Officer of Naviant from August 2002 until his departure in June 2003.

e.    Robert Conley, who served as Naviant's Controller before the acquisition, was Controller from August 2002 until his departure from Naviant in March 2003.

f.    Scott Frohman, who served as Naviant's Vice President of Sales before the acquisition, was a Vice President of Naviant from August 2002 until his departure in March 2003.

g.    Marc Rona, who served as Director of Sales before the acquisition, was a Vice President of Naviant from August 2002 until his departure in July 2003.

28.

Two individuals who had served as officers of Naviant ceased to be employed by Naviant following the acquisition on August 15, 2002:

a.    Scott Hirsch served as Naviant's Chief Operating Officer before the acquisition. Mr. Hirsch became a consultant of Naviant for several months following the acquisition.

b.    Rick Schell served as Naviant's Chief Financial Officer before the acquisition.

29.

Mr. Brauser and the following individuals were Directors of Naviant before the acquisition:

15

ATLLIB01 1785694.4

a.      Charles Stryker, who, on information and belief, is or was affiliated with Venture Development Center, Inc., one of the Former Option Holders.

b.      Mike Perlis, who, on information and belief, is or was affiliated with BERG, LLC, Softbank Capital Partners LP, Softbank Capital Advisors Fund LP and Softbank Capital LP, respectively, all of which are Company Shareholders.

c.      Robert Keith, who is or was Managing Director of TL Ventures III L.P., TL Ventures III Interfund, L.P., TL Ventures III Offshore, L.P., TL Ventures IV L.P. and TL Ventures IV Interfund, L.P., respectively, all of which are Company Shareholders.

d.      Jeff Killeen, who is one of the Former Option Holders.

e.      Joe Aragona, who is or was General Partner of Austin Ventures VII, L.P. and Austin Ventures VIII, L.P., respectively, both of which are Company Shareholders.

30.

Following Mr. Brauser's departure in April 2003, through an internal investigation, Equifax has learned that (1) information furnished to Equifax in connection with the acquisition, including Naviant's financial statements and other data upon which Equifax relied to its detriment, and (2) representations made to Equifax in connection with the acquisition, including many of the representations and warranties in Article 6 of the Merger Agreement, were materially false and misleading.

31.

Specifically, Equifax has learned, and alleges, that Michael Brauser, Richard Kaufman, Rodger Berman, Steve Stowell, Robert Conley, Marc Rona, Scott Hirsch, Seisint, Inc. and SweepsClub.com, Inc. or one or more of them, and other individuals or entities affiliated, associated or acting in concert with them, including, without limitation, third-party customers

16

and vendors and some of the Company Shareholders (but to Equifax's current knowledge and belief not including the Federal Action Plaintiffs) or Former Option Holders (but to Equifax's current knowledge and belief not including Dan Babb, Ty Baines, Phil Davis, Derek Dubner, Mark Eddy, Charles Eissa, Kevan Fleming, Scott Frohman, Tom Hickey, Richard Hill, Jeff Killeen, John Logan, David Marcil, Adam Mittelburg, Lou Nobile, Elder Ripper, Rick Schell, Steve Siccone, Scott Thaler, Venture Development Center, Inc. or David Wood (the "Not-Presently-Known-To-Have-Been-Complicit Option Holders") and their agents (collectively, the "Co-Conspirators"), deliberately distorted Naviant's pre-acquisition financial condition, results of operations and other data to induce Equifax to acquire Naviant.

32.

Some or all of the Co-Conspirators engaged in activities and transactions that were commercially unreasonable, contained irregularities or constituted self-dealing, including the following:

a.      Devising and perpetrating a scheme by which they caused Naviant to participate in a series of improper, reciprocal transactions with certain of its customers or vendors (e.g., eDemographic, Inc., Opt-In Services, LLC and Tel3.com).  They did so by engaging in the fictitious purchase and sale of e-mail fulfillment services and the fictitious purchase and sale of consumer data.  As a result of these transactions, which lacked economic substance, in whole or in part, and which were referred to as "Roundtrips" or "Management Deals," some or all of the Co-Conspirators attributed pre-acquisition revenues, expenses and capital expenditures to Naviant that it did not earn or properly incur, and overstated Naviant's pre-acquisition sales revenue and profits as follows:

17

(i)     In some instances, Naviant and the customers or vendors involved in the purported transactions did not provide or obtain any services or sell or acquire any consumer data. Yet, some or all of the Co-Conspirators issued invoices from Naviant to the customers or vendors for the sale of non-existent fulfillment services and collected payments on the invoices. In turn, and often nearly concurrently, the customers or vendors involved in the reciprocal transactions invoiced Naviant for the sale of a comparable dollar amount of non-existent fulfillment services or consumer data, and Naviant paid the invoices or some portion thereof. When the transactions involved the purported exchange of fulfillment services for consumer data, the fictitious fulfillment services were recorded as revenue to Naviant and the phony data purchases were capitalized on Naviant's books, thereby overstating Naviant's revenue and profits and recording as assets data Naviant did not receive.

(ii)    In other instances, some or all of the Co-Conspirators invoiced customers or vendors involved in the reciprocal transactions for services actually rendered by Naviant, but at amounts greater than the value of services provided, thereby inflating Naviant's revenues. In turn, the customers or vendors involved in these reciprocal transactions invoiced Naviant for the sale of a comparable dollar amount of fulfillment services or data, but at amounts greater than the value of services or data actually provided, thereby inflating Naviant's expenses and capital expenditures.

(iii)    Some or all of the Co-Conspirators also accounted for "CPA" (Cost Per Action, Cost Per Acquisition or Cost Per Account) e-mail marketing campaigns, which

18

earn revenue only when and to the extent e-mail recipients respond to a solicitation (e.g., placing an order, etc.), as if they were "CPM" (Cost Per Thousand) e-mail marketing campaigns, which earn revenue as soon as the e-mails are sent to the targeted consumers.  This resulted in the recognition of unearned, pre-acquisition revenue on Naviant's books and records.

(iv)    Transactions of the kind described in subparagraphs (a)(i) through (a)(iii) also resulted in the payment of bonuses or commissions on the basis of spurious transactions for which there was little or no economic benefit to Naviant.

b.    To perpetrate the activities and transactions described in subparagraph (a), some or all of the Co-Conspirators concealed information, lied, falsified invoices, diverted money and other assets or resources of Naviant, caused false entries to be made on Naviant's books and records, overrode internal accounting controls, manipulated Naviant's order fulfillment system to report shipments or transmissions that never occurred and concealed information.

c.    Transactions of the kind described in subparagraphs (a)(i) through (a)(iii) accounted for a significant percentage of Naviant's purported pre-acquisition sales and operating income.

33.

Some or all of the Co-Conspirators also provided false and misleading information to Ernst & Young LLP ("E&Y"), whom Equifax engaged to conduct financial due diligence in connection with its acquisition of Naviant.

34.

In addition to furnishing E&Y with erroneous financial data that falsely attributed revenues, expenses and capital expenditures to the spurious transactions described above, some

19

or all of the Co-Conspirators provided other data to E&Y that was materially false and misleading, including a file purporting and represented to contain all of Naviant's CPM transactions for the seventeen months ending May 31, 2002.

35.

Because revenues from CPM e-mail marketing campaigns accounted for the majority of Naviant's revenues in calendar year 2001 and the first five months of 2002, and due to the increasing preference among customers in the e-mail marketing industry for CPA e-mail marketing campaigns and other pricing pressures affecting CPM transactions, analyzing Naviant's CPM transactions was an important part of E&Y's financial due diligence.

36.

Based on its analysis of the data furnished by some or all of the Co-Conspirators, E&Y concluded that Naviant's effective CPM rate had dropped from $140 in January 2001 to approximately $60 in January 2002, and had remained relatively constant throughout 2002.

37.

Through its investigation, however, Equifax has discovered that the file purporting to contain all CPM transactions for January through May 2002 (the five-month period on which E&Y concentrated its financial due diligence) was materially incomplete, omitting more than 1 billion CPM e-mails and approximately $3,000,000 in revenue attributable to high-volume, low-priced CPM transactions during the five-month period ending May 31, 2002.

38.

It appears that some or all of the Co-Conspirators maintained two sets of CPM data, and one or more of the Co-Conspirators furnished materially incomplete information to E&Y that distorted its price-volume analysis.

20

39.

The failure to disclose high-volume, low-priced CPM transactions created a false sense of CPM price stability, misstated e-mail volume, disguised database fatigue and distorted the discounted cash flow valuation model that Equifax employed in connection with its acquisition of Naviant.

40.

Some or all of the Co-Conspirators also misrepresented or concealed information concerning the number of Valid and Unique Records purportedly owned by Naviant and housed in its databases of opt-in or permission-based e-mails.  Through its investigation, Equifax has discovered that the actual number of Valid and Unique Records was significantly less than any of the numbers represented to Equifax in connection with the transaction, including the 65,000,000 minimum figure set forth in Paragraph 6.12(c) of the Merger Agreement.

41.

Had Equifax known that Naviant's databases did not contain at least 65,000,000 Valid and Unique Records, that materially incomplete information had been furnished to E&Y with respect to its price-volume analysis or that Naviant's revenues and profits were inflated as a result of transactions lacking economic substance, Equifax would not have acquired Naviant.

42.

Material factual misrepresentations made to Equifax by some or all of the Co-Conspirators and the concealment of material facts the Co-Conspirators were under a duty to disclose concerning Naviant included misrepresentations and omissions as to (a) the non-existence of any untrue statement or omission of a material fact necessary to make the statements contained in the Merger Agreement and the Disclosure Memorandum (including the Financial

21

Statements) not misleading; (b) the non-existence of any fact not disclosed to Equifax that materially and adversely affected the business, assets, properties, operations, prospects, condition (financial or otherwise), results of operations or liabilities of Naviant or its Subsidiaries; (c) the accuracy and completeness of Naviant's books, records and accounts; (d) the implementation and maintenance of a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, and maintain accountability for assets; (e) the propriety and amount of notes and accounts receivable that purportedly arose in the ordinary course of business and represented bona fide obligations to Naviant; (f) the validity and amount of database data and activity; (g) the non-existence of any written or oral contract or material transaction not in the ordinary course of business; (h) the absence of any Material Adverse Change; (i) the existence of audited and unaudited financial statements prepared in accordance with GAAP, consistently applied, that presented fairly the financial position and results of operations of Naviant and its Subsidiaries and were consistent and complete with their books and records; and (j) the accuracy and completeness of files purporting and represented to contain all of Naviant's CPM transactions for the seventeen months ending May 31, 2002. These misrepresentations and omissions, together with those alleged in the preceding paragraphs, are collectively referred to herein as the "Misrepresentations and Omissions."

D.     Post-Acquisition Misconduct and Ensuing Investigation

43.

Some of the Co-Conspirators engaged in spurious activities and transactions of the kind described above after Equifax acquired Naviant in August 2002. They did so to (a) obscure their pre-acquisition misconduct, (b) inflate post-acquisition revenues in order to meet post-

22

acquisition revenue targets that were based largely on Naviant's inflated pre-acquisition revenues and (c) continue to divert assets and resources of Naviant to themselves or to other individuals or entities affiliated, associated or acting in concert with them, including, without limitation, the payment of excessive and unauthorized bonuses and commissions.

44.

By continuing to engage in spurious activities and transactions after the acquisition, and by continuing to conceal information, lie, falsify invoices and make false entries on Naviant's books and records, among other things, these Co-Conspirators, who engaged in improper activities and transactions after the acquisition, delayed Equifax's discovery of suspect transactions and its development of proof concerning what occurred before and after the acquisition in August 2002.

45.

Nevertheless, upon the discovery of potential post-acquisition wrongdoing following Mr. Brauser's departure, and despite a lack of meaningful cooperation by some of the individuals or entities involved in the above-described activities and transactions, and deliberate efforts by others to frustrate its efforts, Equifax diligently, reasonably and promptly investigated post-acquisition suspect transactions.

46.

Upon corroborating the existence and substance of post-acquisition irregularities, Equifax identified and investigated pre-acquisition suspect transactions.

ATLLIB01 1785694 4

E.      Arbitrability and Preservation of Claims

47.

In Paragraph 14 of the Merger Agreement, the parties expressly waived their rights to a trial by jury and agreed that any and all disputes – other than with respect to the Closing Balance Sheet or the calculation of the Net Working Capital – arising out of or in connection with the execution, interpretation, performance or nonperformance of the Merger Agreement ("Disputed Matters") would be solely and finally settled by binding arbitration.  (Merger Agreement ¶ 14.4(a), (b))

48.

The parties further agreed to arbitrate any Disputed Matters in Miami, Florida before a panel of three arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association; provided, however, that the provisions of the Merger Agreement prevail in the event of any conflict between the Merger Agreement and the Commercial Arbitration Rules of the American Arbitration Association.  (Id. ¶ 14.4(b), (c))

49.

As set forth above, and in accordance with the broad arbitration provision in the Merger Agreement, Equifax has initiated arbitration against the individuals and entities named herein as defendants.  Equifax is seeking rescission of its acquisition of Naviant in the arbitration, and, without waiving its claim for rescission, is seeking money damages on claims arising out of or in connection with breaches of representations and warranties in the Merger Agreement and other acquisition-related misconduct giving rise to claims under the Merger Agreement.  Equifax is not, however, seeking recovery in the arbitration or in this complaint for any claim arising out of

24

or in connection with post-acquisition misconduct, even though such misconduct may be probative of the acquisition-related claims for which Equifax is seeking relief.

50.

To the extent any of its claims are held not to be arbitrable and it becomes necessary to litigate any of them in this Court, Equifax is not seeking recovery in this complaint on the basis of any post-acquisition misconduct.  Rather, the express purpose of this action is to preserve acquisition-related claims that could become untimely if Equifax does not assert them in court and they are found not to be arbitrable.

COUNT ONE – RESCISSION UNDER FLORIDA SECURITIES AND INVESTOR PROTECTION ACT (Fla. Stat. Ann. § 517.211)

51.

Equifax repeats and incorporates by reference paragraphs 1 through 50 above as if fully set forth herein.

52.

Under the Florida Securities and Investor Protection Act,

(1)  It is unlawful and a violation of the provisions of this chapter for a person:

(a)  In connection with . . . the offer, sale, or purchase of any investment or security, . . ., directly or indirectly:

1.  To employ any device, scheme, or artifice to defraud;

2.  To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

3.  To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

(Fla. Stat. Ann. § 517.301)

53.

In connection with Equifax's acquisition of the shares of Naviant, some or all of the Co-Conspirators employed devices, schemes and artifices to defraud Equifax, as alleged above; obtained money by means of the Misrepresentations and Omissions, which were untrue statements of a material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices and courses of business, as alleged above, which operated and were intended to operate as a fraud or deceit upon Equifax.

54.

Some or all of the Co-Conspirators did so with the specific intent to deceive and defraud Equifax and to induce it to acquire Naviant. Alternatively, some or all of the Co-Conspirators acted negligently, wantonly or with reckless disregard for the truth by means of the Misrepresentations and Omissions.

55.

Some or all of the Co-Conspirators knew or should have known the Misrepresentations and Omissions to be false and misleading.

56.

The Florida Securities and Investor Protection Act also provides that

> [a]ny person purchasing or selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security.

(Fla. Stat. Ann. § 517.211(2))

26

57.

"'[S]ale' or 'sell' means any contract of sale or disposition of any investment, security, or interest in a security, for value." (Fla. Stat. Ann. § 517.021(19))

58.

"'Security' includes . . . stock [and a]ny option contract which entitles the holder to purchase or sell a given amount of the underlying security at a fixed price within a specified period of time." (Fla. Stat. Ann. § 517.021(20)(b)&(t))

59.

The Company Shareholders and Former Option Holders sold securities to Equifax for value in connection with its acquisition of Naviant.

60.

Equifax is entitled to rescind its acquisition of Naviant and to recover the consideration it paid in connection with the transaction, plus interest thereon at the legal rate. (Fla. Stat. Ann. § 517.211(2)-(3))

61.

In addition, Equifax is entitled to recover its reasonable attorney's fees. (Fla. Stat. Ann. § 517.211(6))

## COUNT TWO – INDEMNIFICATION

62.

Equifax repeats and incorporates by reference paragraphs 1 through 61 above as if fully set forth herein.

ATLLIB01 1785694.4

63.

By reason of the Misrepresentations and Omissions, the representations and warranties in Article 6 of the Merger Agreement were breached.

64.

The Misrepresentations and Omissions and the breaches arose out of fraud, intentional misrepresentations, willful misconduct or criminal conduct.

65.

The Company Shareholders and Former Option Holders, as Indemnitors, are liable to Equifax for such damages as have been or may be caused to Equifax by reason of the foregoing in amounts to be proven at trial (in the event Equifax's claim for indemnification is not arbitrable). Such damages are not limited to the Escrow Fund, and specifically include, without limitation, (a) some or all of the monetary consideration Equifax paid to acquire Naviant, (b) the costs, fees and expenses Equifax has incurred to investigate the above-described activities and transactions and (c) Equifax's attorney's fees and other expenses of litigation. Such damages are presently estimated to exceed $10,000,000.

66.

In accordance with Paragraph 11.2 of the Merger Agreement, Equifax has provided the Company Shareholders and Former Option Holders, through their appointed agent, Softbank, timely written demand for indemnification pursuant to Article 11 of the Merger Agreement.

## COUNT THREE – FRAUD, DECEIT AND MISREPRESENTATION

67.

Equifax repeats and incorporates by reference paragraphs 1 through 66 above as if fully set forth herein.

28

68.

Some or all of the Co-Conspirators, including Michael Brauser, Richard Kaufman, Rodger Berman, Steve Stowell, Robert Conley, Marc Rona, Scott Hirsch, Seisint, Inc. and SweepsClub.com, Inc., made, participated in, aided, abetted, procured and counseled the Misrepresentations and Omissions.

69.

The Misrepresentations and Omissions were material to Equifax and concealed material information some or all of the Co-Conspirators were under a duty to disclose concerning Naviant's business, financial condition and performance and operations.

70.

Some or all of the Co-Conspirators acted as alleged above with the specific intent to deceive and defraud Equifax.

71.

The Misrepresentations and Omissions were false and misleading to Equifax, and some or all of the Co-Conspirators knew or should have known them to be false and misleading.

72.

Equifax justifiably relied on the Misrepresentations and Omissions in connection with its purchase of Naviant.

73.

As a direct and proximate result of the above-described acts or omissions, Equifax has suffered damages in amounts to be proven at trial (in the event Equifax's claim for fraud, deceit and misrepresentation is not arbitrable). Some or all of the Co-Conspirators are jointly and severally liable to Equifax for such damages.

74.

Some or all of the Co-Conspirators acted intentionally, willfully, maliciously and with such gross negligence, recklessness or wantonness as to indicate a conscious disregard or indifference to Equifax's rights, thus warranting the imposition of punitive damages against them in an amount determined at trial (in the event Equifax's claim for punitive damages is not arbitrable) to punish, penalize or deter them from engaging in similar misconduct.

<u>COUNT FOUR –RECOVERY FROM MICHAEL BRAUSER<br>UNDER SELLING SHAREHOLDERS AGREEMENT</u>

75.

Equifax repeats and incorporates by reference paragraphs 1 through 74 above as if fully set forth herein.

76.

As a Selling Shareholder, Michael Brauser, with others, entered into a Selling Shareholders Agreement with Equifax, dated August 15, 2002.

77.

In Section 1.7 of the Selling Shareholders Agreement, Michael Brauser represented and warranted to Equifax that "[t]o the Actual Knowledge of such Shareholder, the representations and warranties of the Company [Naviant] set forth in the Merger Agreement are correct and complete." Actual Knowledge is defined in the Selling Shareholders Agreement to mean, in the case of Michael Brauser, those facts, circumstances or events that were within his actual current conscious knowledge as of August 15, 2002.

30

78.

As specifically alleged above, the representations and warranties of the Company [Naviant] set forth in the Merger Agreement were not correct or complete, for the reasons specified above.

79.

By virtue of having undertaken, participated in, aided, abetted, procured and counseled and having directed or pressured others to undertake, participate in or perpetrate the spurious activities and transactions described in paragraph 32 above (including bogus, circular transactions with eDemographic, Inc. and other conspiring customers or vendors and the deliberate falsification and manipulation of accounting and financial information and records), and by virtue of having made, participated in, aided, abetted, procured and counseled the Misrepresentations and Omissions, the facts, circumstances and events showing that the representations and warranties of the Company [Naviant] set forth in the Merger Agreement (including the representations and warranties set forth in paragraph 17 hereof) were not correct and complete, for the reasons specified above, and the facts, circumstances and events constituting the fraud alleged above were within Michael Brauser's actual current conscious knowledge as of August 15, 2002, and Michael Brauser had Actual Knowledge, as that term is used in the Selling Shareholders Agreement, that the representations or warranties of Naviant in the Merger Agreement (including the representations and warranties set forth in paragraph 17 hereof) were not correct or complete as of August 15, 2002.

80.

Michael Brauser is liable to Equifax under the Selling Shareholders Agreement for all such damages as have been caused to Equifax by reason of the breach of his representations and warranties made in the Selling Shareholders Agreement as set forth in the foregoing.

81.

The limitation of liability to a Shareholder's Merger Consideration set forth in Section 2.9 of the Selling Shareholders Agreement is expressly limited to breaches that "do not arise from fraud by such Shareholder." The breaches do arise from fraud by Michael Brauser, so the limitation is inapplicable. Even were the limitation applicable, Michael Brauser would still be liable for the breaches up to the aggregate amount of Merger Consideration Michael Brauser received pursuant to Paragraph 4.1 of the Merger Agreement.

WHEREFORE, Equifax respectfully prays:

(a)    that the Court stay this action – as to Counts One through Three pending a final, non-appealable ruling regarding the arbitrability of Equifax's claims or for confirmation of an arbitration award, and as to Count Four until Equifax or Michael Brauser shows that a further stay is not appropriate;

(b)    that the Court rescind Equifax's purchase of Naviant's stock effective August 15, 2002 and award Equifax judgment for restitution from defendants, jointly and severally, plus interest at the legal rate and Equifax's reasonable attorney's fees, pursuant to Count One;

(c)    that the Court enter judgment in Equifax's favor and against defendants for indemnification under Count Two;

(d)     that the Court enter judgment in Equifax's favor for its damages under Count Three, against all defendants (except the Federal Action Plaintiffs and the Not-Presently-Known-To-Have-Been-Complicit Option Holders), jointly and severally;

(e)     that the Court enter judgment in Equifax's favor for an award of punitive damages under Count Three, against all defendants (except the Federal Action Plaintiffs and the Not-Presently-Known-To-Have-Been-Complicit Option Holders);

(f)     that the Court enter judgment in Equifax's favor for its damages under Count Four against Michael Brauser;

(g)     that the Court award Equifax prejudgment interest; and

(h)     for such other and further relief as the Court deems just and proper.

COUNT FIVE – RECOVERY FROM SEISINT, INC.<br/>UNDER SELLING SHAREHOLDER AGREEMENT

82.

Equifax repeats and incorporates by reference paragraphs 1 through 81 above as if fully set forth herein.

83.

As a Selling Shareholder, Seisint, Inc. ("Seisint"), with others, entered into a Selling Shareholders Agreement with Equifax, dated August 15, 2002.

84.

In Section 1.7 of the Selling Shareholders Agreement, Seisint represented and warranted to Equifax that "[t]o the Actual Knowledge of such Shareholder, the representations and warranties of the Company [Naviant] set forth in the Merger Agreement are correct and complete." Actual Knowledge is defined in the Selling Shareholders Agreement to mean, in the

33

case of Seisint, those facts, circumstances or events that were within his actual current conscious knowledge as of August 15, 2002.

85.

As specifically alleged above, the representations and warranties of the Company [Naviant] set forth in the Merger Agreement were not correct or complete, for the reasons specified above.

86.

After a reasonable opportunity for further investigation or discovery, Equifax is likely to have evidentiary support that Seisint, by virtue of having participated in, aided, abetted, procured, or counseled certain of the Misrepresentations and Omissions, the facts, circumstances and events showing that the representations and warranties of the Company [Naviant] set forth in the Merger Agreement (including certain of the representations and warranties set forth in paragraph 17 hereof) were not correct and complete, for the reasons specified above (and including the fact that Seisint, through Hank Asher, who was employed by Seisint as of August 15, 2002 and had served as a former director or officer of Naviant or its subsidiaries, had conducted a data count of Naviant's databases prior to closing and had represented that the databases contained more than 158,000,000 unique e-mail addresses, when, on the date of closing, Hank Asher had actual current conscious knowledge that Naviant had represented in the Merger Agreement that it had at least 65,000,000 Valid and Unique Records and that Naviant actually had less than 65,000,000 Valid and Unique Records), and the facts, circumstances and events constituting the fraud alleged above were within Seisint's actual current conscious knowledge as of August 15, 2002, and Seisint had Actual Knowledge, as that term is used in the Selling Shareholders Agreement, that the representations or warranties of Naviant in the Merger

34

Agreement (including certain of the representations and warranties set forth in paragraph 17 hereof) were not correct or complete as of August 15, 2002.

87.

After a reasonable opportunity for further investigation or discovery, Equifax is likely to have evidentiary support that Seisint is liable to Equifax under the Selling Shareholders Agreement for all such damages as have been caused to Equifax by reason of the breach of his representations and warranties made in the Selling Shareholders Agreement as set forth in the foregoing.

88.

After a reasonable opportunity for further investigation or discovery, Equifax is likely to have evidentiary support that the limitation of liability to a Shareholder's Merger Consideration set forth in Section 2.9 of the Selling Shareholders Agreement is expressly limited to breaches that "do not arise from fraud by such Shareholder." The breaches do arise from fraud by Seisint, so the limitation is inapplicable. Even were the limitation applicable, Seisint would still be liable for the breaches up to the aggregate amount of Merger Consideration Seisint received pursuant to Paragraph 4.1 of the Merger Agreement.

WHEREFORE, Equifax respectfully prays:

(a)     that the Court stay this action as to Counts One through Three pending a final, non-appealable ruling regarding the arbitrability of Equifax's claims or for confirmation of an arbitration award, and as to Count Four until Equifax or Michael Brauser shows that a further stay is not appropriate;

(b)     that the Court rescind Equifax's purchase of Naviant's stock effective August 15, 2002 and award Equifax judgment for restitution from defendants, jointly and severally, plus interest at the legal rate and Equifax's reasonable attorney's fees, pursuant to Count One;

(c)     that the Court enter judgment in Equifax's favor and against defendants for indemnification under Count Two;

(d)     that the Court enter judgment in Equifax's favor for its damages under Count Three, against all defendants (except the Federal Action Plaintiffs and the Not-Presently-Known-To-Have-Been-Complicit Option Holders), jointly and severally;

(e)     that the Court enter judgment in Equifax's favor for an award of punitive damages under Count Three, against all defendants (except the Federal Action Plaintiffs and the Not-Presently-Known-To-Have-Been-Complicit Option Holders);

(f)     that the Court enter judgment in Equifax's favor for its damages under Count Four against Michael Brauser;

(g)     that the Court enter judgment in Equifax's favor for its damages under Count Five against Seisint;

(h)     that the Court award Equifax prejudgment interest; and

(i)     for such other and further relief as the Court deems just and proper.

ATLLIB01 1785694 4

Respectfully submitted,

RICHMAN GREER WEIL BRUMBAUGH
MIRABITO & CHRISTENSEN, P.A.
*Attorneys for Plaintiff*
One Clearlake Centre
250 Australian Avenue South, Suite 1504
West Palm Beach, Florida  33401
Phone:  (561) 803-3500
Fax:  (561) 820-1608

By: _____
    GERALD F. RICHMAN
    Florida Bar Number 066457
    JOHN R. WHITTLES
    Florida Bar Number 0178802

**Exhibit 1 to Complaint to Preserve Claims Pending Arbitration**

<u>COMPANY SHAREHOLDERS</u>

Austin Ventures VII, L.P.
300 West 6th Street, Suite 2300
Austin, Texas  78701

Austin Ventures VIII, L.P.
300 West 6th Street, Suite 2300
Austin, Texas  78701

BERJ, LLC (f/k/a BERJ, Inc.)
c/o Softbank Capital Partners LP
1188 Centre Street
Newton Center, Massachusetts  02459

Michael Brauser
3164 NE 31st Avenue
Lighthouse Point, Florida 33064

Seisint, Inc.
6601 Park of Commerce Blvd.
Boca Raton, Florida  33487

Softbank Capital Partners LP
1188 Centre Street
Newton Center, Massachusetts  02459

Softbank Capital Advisors Fund LP
1188 Centre Street
Newton Center, Massachusetts  02459

Softbank Capital LP
1188 Centre Street
Newton Center, Massachusetts  02459

SweepsClub.com, Inc.
550 Fairway Dr., Suite 203
Deerfield Beach, Florida  33441

TL Ventures III L.P.
435 Devon Park Dr., 700 Building
Wayne, Pennsylvania  19087

TL Ventures III Interfund, L.P.
435 Devon Park Dr., 700 Building
Wayne, Pennsylvania  19087

TL Ventures III Offshore, L.P.
435 Devon Park Dr., 700 Building
Wayne, Pennsylvania  19087

TL Ventures IV L.P.
435 Devon Park Dr., 700 Building
Wayne, Pennsylvania  19087

TL Ventures IV Interfund, L.P.
435 Devon Park Dr., 700 Building
Wayne, Pennsylvania  19087

<u>FORMER OPTION HOLDERS</u>

Dan Babb
2554 Jardin Manor
Weston, Florida  33327

Ty Baines
6337 Northdale Court
San Jose, California  95123

Rodger Berman
95 Horatio Street, Apartment 704
New York, New York  10014

Michael Brauser
3164 NE 31st Avenue
Lighthouse Point, Florida 33064

Robert Conley
10730 Paso Fino Drive
Wellington, Florida  33467

Phil Davis
4770 Glenn Pine Lane
Boynton Beach, Florida  33436

**Exhibit 1**
2

ATLLIB01 1785694 4

Derek Dubner
2424 NW 40th Circle
Boca Raton, Florida  33431

Mark Eddy
2553 Cranbrook Drive
Boynton Beach, Florida  33436

Charles Eissa
921 SE 5th Avenue
Pompano Beach, Florida  33060

Kevan Fleming
119 NE 2nd Avenue
Deerfield Beach, Florida  33441

Scott Frohman
620 Golden Harbour Drive
Boca Raton, Florida  33432

Tom Hickey
73 Parkway West
Mount Vernon, New York  10552

Richard Hill
8855 NW 18th Street
Coral Springs, Florida  33071

Scott Hirsch
6368 Old Medinah Circle
Lake Worth, Florida  33463

Richard Kaufman
21159 Falls Ridge Way
Boca Raton, Florida  33428

Jeff Killeen
21 Woodside Lane
Westport, Connecticut  06880

John Logan
6071 Newport Village Way
Lake Worth, Florida  33463

**Exhibit 1**

ATLLIB01 1785694 4

David Marcil
822 SW Blue Stem Way
Stuart, Florida  34997

Adam Mittelburg
1172 Birchwood Road
Weston, Florida  33327

Lou Nobile
6548 Serena Lane
Boca Raton, Florida  33433

Elder Ripper
393 Gilston Court
Heathrow, Florida  32746

Marc Rona
224 W 18th Street, Apartment 1C
New York, New York  10011

Rick Schell
3751 NE 27th Terrace
Lighthouse Point, Florida  33064

Steve Siccone
5051 NW 88th Lane
Coral Springs, Florida  33067

Steve Stowell
1665 SW 2nd Avenue
Boca Raton, Florida  33432

Scott Thaler
6911 NW 104th Lane
Parkland, Florida  33076

Venture Development Center, Inc.
1156 Bowman Road, Suite 200
Mt. Pleasant, South Carolina  29464

David Wood
7880 Ambleside Way
Lake Worth, Florida  33467

**Exhibit 1**

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** EQUIFAX INC.

**DEFENDANTS** AUSTIN VENTURES VII, L.P. ET AL.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Fulton County, GA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Travis County, Texas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

04-80754

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Gerald F. Richman and John R. Whittles, 250 Australian Ave. So. #1504 West Palm Beach FL 33401 561-803-3500

ATTORNEYS (IF KNOWN)

CIV-PAINE

04CV80754 DC

MAGISTRATE JUDGE JOHNSON

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION     (PLACE AN X IN ONE BOX ONLY)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                            AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT     (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.) 28 U.S.C. §1332

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

DEMAND $
> $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY
JUDGE _____   DOCKET NUMBER _____

DATE
8/13/04

SIGNATURE OF ATTORNEY OF RECORD
_Gerald F. Richman_

FOR OFFICE USE ONLY

RECEIPT # 72039   AMOUNT $ 150.00   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___